Filed 5/8/14  In re D.P. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re D.P., a Person Coming Under the Juvenile Court Law. | B251302 (Los Angeles County Super. Ct. No. CK80799) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. CINDY P., Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert S. Draper, Judge.  Affirmed in part; dismissed in part.

Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Cindy P. (mother) challenges the juvenile court's jurisdictional and dispositional orders in this appeal. We dismiss as moot the portion of the appeal seeking review of the dispositional order and affirm the jurisdictional order.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Detention*

Six-year-old D.P. came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) when a referral alleged mother and D.P. were living with maternal grandmother, and mother had been using drugs and alcohol, which caused her to become violent and aggressive toward maternal grandmother. The referral alleged mother had pushed and spit on maternal grandmother in D.P.'s presence. D.P. had allegedly intervened in the past in an attempt to protect maternal grandmother, and mother had hit him in the face. After the referral, additional allegations were made that D.P. was the victim of sexual abuse by an unrelated male, Lawrence G., who was mother's coworker.

Mother and D.P. had lived with maternal grandmother and grandfather for approximately six years. Right before the referral, in June 2013, mother and D.P. abruptly moved out of maternal grandmother's house and stayed with Lawrence G. They left Lawrence G.'s place because his lease agreement allowed for one person occupancy only. They did not have anywhere to stay, and mother was exploring transitional living programs, motel vouchers, and additional referrals from the Los Angeles County Department of Public Social Services.

D.P. told the social worker that mother and maternal grandmother did not get along. He said that when mother drank wine and beer she became "mad and crazy." She drank wine or beer every day. He thought maternal grandmother and mother hated each other and had heard maternal grandmother tell mother that she needed medicine because she was "crazy." When they argued, they yelled bad words at each other, and he witnessed physical altercations between them. He became "scared" when they argued and did not know what to do. He also indicated Lawrence G. touched him in the area of his penis and buttocks. Later he told the social worker Lawrence G. was his "friend" and

2

did not touch him. He reported that maternal grandmother told him to say those things about Lawrence G. so that he could "go home with her."

Maternal grandmother told the social worker she wanted a legal guardianship over D.P. She said mother had an extensive substance abuse problem with marijuana and a "white powder." She felt mother was schizophrenic. Mother had "beat[] [her] up," pushed her down stairs, punched her, and spit at her. She also "belittle[d] everyone" and had anger problems. Mother took D.P. and left maternal grandmother's home around June 21, 2013, but she brought D.P. back because she did not have other childcare arrangements. D.P. was acting "not normal" and when maternal grandmother asked him what was wrong, he described how Lawrence G. had touched him inappropriately.

Mother said she had always had a volatile relationship with her parents, but she had struggled with childcare and relied on maternal grandmother to assist her. She described her childhood as "rough" and said both her parents physically and emotionally abused her. She denied any history of mental health services, psychotropic medication, or any mental health diagnosis. She reported drinking socially and experimenting with methamphetamine when she was younger. She denied any substance abuse. She also denied hitting maternal grandmother but admitted to spitting on her and having heated arguments with her. She said maternal grandmother had hit her and wished death on her, had mood swings, and was crazy and violent. Maternal grandmother and grandfather had thrown her and D.P. out of their house. Lawrence G. let them stay with him after that. She did not believe he had done anything to D.P. She believed D.P. had conflicting versions of the alleged inappropriate touching and maternal grandmother was coaching him.

Francis B. (father) said that he did not "know [his] son" but he wanted to be in his life. He said mother "pushed [him] away" and was vulgar and violent. He had previously filed police reports against her because she was threatening his girlfriend. He believed mother was an alcoholic and bipolar. She used marijuana, cocaine, Ecstasy, and methamphetamine when they were together. He had heard mother tell D.P. that he was

3

dead. Father had a criminal history and said he was working towards a governor's pardon.

DCFS filed a petition under Welfare and Institutions Code section 300[1] alleging mother and maternal grandmother had a history of engaging in violent altercations in D.P.'s presence, Lawrence G. had sexually abused D.P., mother had a history of substance abuse, and father had a criminal history. The court found a prima facie case for detaining D.P. It ordered him detained in shelter care and gave DCFS discretion to detain him with any appropriate relative but found that maternal grandmother was not an appropriate relative.

## 2. *Jurisdiction and Disposition*

When interviewed again for the jurisdiction/disposition report, D.P. elaborated on the altercations between mother and maternal grandmother. He said he had seen the two of them fighting, hitting, punching, and spitting. They both did these things to each other. He did not know who started the fights. He tried to help them but they "push[ed] [him] back." He explained that he lied previously when he said Lawrence G. touched him. He was unable to say why he lied. He was "sad" because he did not think he was going to go to a foster home when he lied.

Mother again denied doing anything to maternal grandmother except having "bad arguments" with her in front of D.P. and spitting on her. They got close to each other during arguments; she thought maybe that was why it seemed like they were physical. Maternal grandmother had anger and resentment towards mother because she felt like mother was "using" her to care for D.P. without paying her. Mother described her current relationship with both her parents as "toxic." The week after maternal grandmother kicked them out of her house, mother was in a bind and had to ask maternal grandmother to watch D.P. while she was working. This was when she received a telephone call from the police asking her to go to the station because someone had

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

4

reported allegations of sexual abuse in relation to D.P. She still believed the allegations were absolutely untrue and maternal grandmother was coaching D.P.

Father had never seen mother and maternal grandmother "put hands on each other," but he had seen mother verbally abusing maternal grandmother. He felt she was "hotheaded" and capable of being physical. Maternal grandmother had contacted him about getting custody of D.P. She said D.P. was in danger because mother was using drugs. He believed her because he knew mother to be a drug user in the past. Maternal grandmother's plan was for father to seek full custody in the family court, and he would in turn permit D.P. to live with maternal grandmother. Father tried to do this, but the court denied custody to him.

Maternal grandmother denied perpetrating any violence against mother. She felt mother was the always the aggressor in their fights. She had never seen mother use drugs but she thought mother did because of her violent behavior, which maternal grandmother felt was "not normal."

The social worker also interviewed Lawrence G. He knew mother and maternal grandmother had "verbal altercations" but knew nothing about physical altercations. Mother was a social drinker but he had never seen her use drugs. He denied the allegations that he sexually abused D.P. He had been alone with D.P. two times, at the most, for an hour and a half to two hours. He had never touched D.P. inappropriately.

DCFS's assessment was that mother and maternal grandmother had created a detrimental and dysfunctional home environment for D.P., causing him emotional distress. It recommended D.P. remain in placement and both mother and father receive reunification services.

At the adjudication hearing, mother's counsel argued the court should "dismiss" the petition under section 360, subdivision (b), which states: "If the court finds that the child is a person described by Section 300, it may, without adjudicating the child a dependent child of the court, order that services be provided to keep the family together and place the child and the child's parent or guardian under the supervision of the social worker for a time period consistent with Section 301." Mother's counsel further argued

5

the court should refuse to sustain all allegations except a modified version of allegation b-2, which would state that mother and maternal grandmother had a history of engaging in verbal altercations in D.P.'s presence, creating a detrimental and dysfunctional home environment and causing him emotional distress. Counsel proposed D.P. then receive individual counseling, a regional center assessment, and conjoint counseling with mother.[2]

The court noted that under the proposal of mother's counsel, "mother would not be required to participate in any programs or receive any services." The court struck all allegations of the petition except the one relating to altercations between mother and maternal grandmother. The single sustained allegation stated: "The child, [D.P.'s] mother, Cindy [P.] and child's maternal grandmother, Guadalupe [P.], have a history of engaging in violent altercations in the presence of the child. On prior occasions, the mother struck the maternal grandmother with the mother's fists and hands. On prior occasions, the mother pushed the maternal grandmother down the stairs. On prior occasions, the mother spat at the maternal grandmother. On prior occasions, the maternal grandmother struck the mother. Such violent conduct on the part of the mother and the maternal grandmother endangers the child's physical health and safety, and places the

---

[2]     Although mother's counsel requested a "dismiss[al]" under section 360, subdivision (b), the court would not dismiss the petition when proceeding under that provision. "'If the court agrees to or orders a program of informal supervision [under section 360, subdivision (b)], it does not dismiss the dependency petition or otherwise set it aside. The true finding of jurisdiction remains. It is only the dispositional alternative of declaring the child a dependent that is not made. This is because if the family is unwilling or unable to cooperate with the services being provided, the social worker may institute proceedings pursuant to Welf. & Inst. Code § 332 (petition to commence proceedings), alleging that a previous petition has been sustained and that informal supervision was ineffective. [Welf. & Inst. Code § 360, subd. (c).]'" (*In re Adam D.* (2010) 183 Cal.App.4th 1250, 1260.) Indeed, counsel's proposal seemed to contemplate the court would not, in fact, dismiss the petition, but would take jurisdiction by sustaining an amended version of allegation b-2. Later in the hearing, counsel did say the petition "should not be dismissed" but "sustained under 360(b)."

child at risk of physical harm, damage and danger." The court declared D.P. a dependent of the court, removed him from mother's custody, and ordered DCFS to suitably place him. For D.P., it ordered individual counseling, a regional center assessment, and conjoint counseling with mother. It also ordered drug testing, individual counseling, and monitored visitation for mother. Mother filed a timely notice of appeal.

### 3. *Progress Hearing and Request for Judicial Notice*

On appeal, DCFS has filed an unopposed request for judicial notice of a minute order from a progress hearing held approximately three months after the adjudication. Generally, we review the correctness of a judgment as of the time of the court's decision and based on a record of the matters before the trial court at the time. (*In re James V.* (1979) 90 Cal.App.3d 300, 304.) However, we may make an exception and "take additional evidence" of postjudgment facts for any purpose in the interests of justice. (Code Civ. Proc., § 909; see *In re Linda P.* (1987) 195 Cal.App.3d 99, 105.) Documents of which we may take judicial notice include records of any California court. (Evid. Code, §§ 452, 459.) Accordingly, we grant DCFS's request for judicial notice of the progress hearing minute order.

The minute order of the progress hearing shows the court terminated the suitable placement order and ordered D.P. placed in mother's home under the supervision of DCFS.

### STANDARD OF REVIEW

We review the jurisdictional finding and the dispositional findings of the juvenile court for substantial evidence. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*Ibid.*) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)

7

**DISCUSSION**

## 1. *Substantial Evidence Supported the Jurisdictional Finding*

The court exercised jurisdiction over D.P. based on section 300, subdivision (b). A child may be adjudged a dependent of the court under subdivision (b) if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." (§ 300, subd. (b).) Mother challenges the court's jurisdictional finding for lack of substantial evidence. We disagree.

Sufficient evidence existed of a substantial risk that D.P. would suffer physical harm as a result of the violent altercations between mother and maternal grandmother. The evidence showed D.P. witnessed physical and verbal arguments between the two and felt they hated each other. He said mother became "mad and crazy" when she drank alcohol every day. He thought they both engaged in hitting, spitting, and yelling. He suggested he tried to intervene in at least one instance and was pushed back, though it was unclear who pushed him between the two of them. Maternal grandmother reported getting in fights with mother in which mother pushed her down stairs, punched her, and spit at her. Father also described mother as violent and hotheaded. He had witnessed mother being verbally abusive toward maternal grandmother. Mother's friend, Lawrence G., had seen verbal arguments between the two. Even mother admitted to "bad" arguments with maternal grandmother and spitting on her. All the witnesses in this case described violent behavior on the part of mother if not maternal grandmother. Such behavior from D.P.'s two caregivers in D.P.'s presence put him at substantial risk of harm, especially because D.P. indicated he was distressed by the violence between the two and had tried to intervene. (See *In re John M.* (2013) 217 Cal.App.4th 410, 419 [jurisdiction proper under § 300, subd. (b) based on history of violence between parents, including both parents hitting each other and frequent verbal altercations]; *In re Heather A., supra*, 52 Cal.App.4th at p. 194 [jurisdiction proper when children put in position of physical danger from domestic violence, "since, for example, they could

8

wander into the room where it was occurring and be accidentally hit" by objects, body parts, or victim of abuse falling against them].)

Mother contends the evidence was scant because the statements of maternal grandmother and D.P. could not be trusted. She argues D.P. lacked credibility because he admitted to lying about Lawrence G. touching him, and maternal grandmother lacked credibility because she had purportedly coached D.P. to lie and was motivated by a desire to take custody of D.P. away from mother. This contention does not persuade. D.P. was very open that he lied with respect to Lawrence G., yet he said nothing about fabricating the evidence of mother's and maternal grandmother's altercations. More to the point, we are not the arbiters of the credibility question. "Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court. Evidence from a single witness, even a party, can be sufficient to support the trial court's findings." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) We may usurp the juvenile court's factfinding role when the statements at issue are inherently improbable, but D.P.'s and maternal grandmother's statements come nowhere near that standard. (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1148.)

Mother also contends there was no current risk of harm to D.P. and no reason to believe harm would occur in the future because mother had moved out of maternal grandmother's home at the time of the adjudication hearing. To the contrary, there was no indication mother's relationship with maternal grandmother, which mother described as "toxic," would improve without intervention. Mother and D.P. had lived with maternal grandmother since D.P.'s birth, and even though they moved out of the home on a Friday, mother took D.P. back the following Wednesday because she had no one else to care for him. Mother was homeless and was not sure where she was going to live. The court had reason to believe mother would continue to rely on maternal grandmother and subject D.P. to the risks associated with their toxic relationship, given these circumstances. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824 [although past incidents alone do not establish a substantial risk of physical harm, jurisdiction may exist where

9

there is "'some reason to believe the acts may continue in the future'"].) Sufficient evidence supported the court's exercise of jurisdiction.

## 2. *The Appeal from the Dispositional Order Is Moot*

Mother also contends substantial evidence did not support the court's dispositional order removing D.P. from her custody. Assuming the court properly took jurisdiction, mother argues it should have placed D.P. with her and ordered services under section 360, subdivision (b). DCFS argues the court's subsequent order placing D.P. in mother's home renders this portion of the appeal moot and moves to partially dismiss the appeal. We hold the subsequent home-of-mother placement order has, indeed, rendered the challenge to the dispositional order moot and dismiss the portion of the appeal from the dispositional order. Even if the issue were not moot, substantial evidence supported the dispositional order.

"'[A]lthough a case may originally present an existing controversy, if before decision it has, through act of the parties or other cause, occurring after the commencement of the action, lost that essential character it becomes a moot case or question which will not be considered by the court.'" (*Wilson v. L. A. County Civil Service Com.* (1952) 112 Cal.App.2d 450, 453.) "'"[A]s a general rule it is not within the function of the court to act upon or decide a moot question or speculative, theoretical or abstract question or proposition, or a purely academic question, or to give an advisory opinion on such a question or proposition. . . ."' [Citation.] An important requirement for justiciability is the availability of 'effective' relief -- that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1490.) "When the court cannot grant *effective* relief to the parties to an appeal, the appeal must be dismissed." (*Ibid.*)

Here, mother asks us to reverse the removal order so that D.P. can be placed with her. But the juvenile court has already terminated the removal order and placed D.P. with her. Our reversal would be an idle act, and thus we may not grant effective relief to mother. The issue of the removal order has become moot. Still, mother asserts the issue is not moot because the removal order could impact her ability to receive reunification

services in any future dependency case and could compromise her position in any family law action. She has not explained how this potential impact could actually occur by, for example, citing to relevant statutes or other authority. Her argument consists solely of the bare assertion without further explanation. This "specter of a future impact" does not rise to the level of a legal or practical consequence that would disincline us to find the issue moot. (*In re I.A., supra*, 201 Cal.App.4th at p. 1494.) To the extent mother is appealing the dispositional order, that part of the appeal should be dismissed as moot.

Even if the issue were not moot, we would affirm the dispositional order. As pertinent here, the court may not remove a dependent minor from the parents' physical custody unless it finds "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor . . . ." (§ 361, subd. (c)(1).) Mother contends there was insufficient evidence of substantial danger to D.P. We disagree. The same evidence we discussed in the foregoing part suggests mother had an issue with hostile or violent behavior, and despite leaving maternal grandmother's home, she would continue to be around maternal grandmother and fight with her. Under these circumstances, the juvenile court could reasonably conclude mother's toxic relationship with maternal grandmother continued to pose a risk of substantial danger to D.P.'s physical and emotional well-being.

Mother argues in the alternative that the court erroneously determined it could not leave D.P. with her *and* order services under section 360, subdivision (b). Her evidence of this error is that, in response to the proposal of mother's counsel to proceed under section 360, the court stated: "Under the proposal by mother's counsel, mother would receive no services at all and not participate in any programs or receive any services." We do not see this as an expression by the court that section 360, subdivision (b) does not permit mother to receive services. Read in context, the court was merely describing mother's proposal, which did not include any of the services the court eventually ordered for mother -- drug testing and individual counseling. The services mother proposed were

11

for D.P. only.  The court's descriptive statement was not evidence of an erroneous interpretation of section 360.

## DISPOSITION

DCFS's request for judicial notice is granted.  DCFS's motion for partial dismissal of the portion of mother's appeal seeking review of the dispositional order is granted, and that portion of the appeal is dismissed.  The court's jurisdictional order is affirmed.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.


GRIMES, J.